# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
### SOUTHERN DIVISION

| | |
|---|---|
| Dakota Truck Underwriters, a South Dakota corporation; First Dakota Indemnity Company, a South Dakota corporation; and Risk Administration Services, Inc., a South Dakota corporation, | Civil No. 07-4036 |
| Plaintiffs, | **COMPLAINT** |
| vs. | **JURY TRIAL REQUESTED** |
| certain Underwriters of Lloyd's of London, a syndicate of underwriters, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

NOW COME the Plaintiffs, Dakota Truck Underwriters ("DTU"), First Dakota Indemnity Company ("FDI"), and Risk Administration Services, Inc. ("RAS") (collectively, the "Assureds"), by and through their attorneys and for their Complaint in this insurance coverage action for Declaratory Judgment and Other Relief, state as follows:

### Nature of Action

1.      The Assureds seek declaratory relief, damages, and other relief from certain Underwriters of Lloyd's of London ("Underwriters") relating to defense costs incurred and settlement amounts paid by the Assureds in Case No. 04-2609 JMR/FLN in the

United States District Court for the District of Minnesota, in the related arbitration, in the subsequent settlement, and in this action.

## Parties

2.     DTU is, and at all relevant times was, a reciprocal insurance exchange domiciled in South Dakota and qualified to transact insurance in South Dakota, with its principal place of business in Sioux Falls, South Dakota.  DTU may legally operate only through RAS, its sole exclusive appointed attorney-in-fact.

3.     FDI is, and at all relevant times was, a stock insurance company incorporated and operating under the laws of the State of South Dakota, with its principal place of business in Sioux Falls, South Dakota.  FDI operates through RAS, its sole exclusive appointed Managing General Agent.  RAS and DTU each own a fifty percent share of FDI.

4.     RAS is, and at all relevant times was, a South Dakota corporation with its principal offices located in Sioux Falls, South Dakota.  RAS delivers administrative services to certain affiliated insurers.  RAS is the attorney-in-fact for DTU as well as a subscriber.  RAS owns a fifty percent share of FDI, and is FDI's third-party administrator and managing general agent.

5.     On information and belief, defendants certain Underwriters of Lloyd's of London subscribing Combined Directors and Officers and Professional Liability Policy No. 823/FD0300761, a syndicate of underwriters, including those affiliated with Lloyd's Underwriter Syndicate Numbers 2147, 1007, 2488 and any others that are otherwise interested in this matter, are residents of the United Kingdom with their headquarters in

-2-

London, England and subject to the jurisdiction of this Court through the insurance contract and conduct of business in this jurisdiction, with service of process to be effected on Messrs. Mendes & Mount, 750 Seventh Avenue, New York, NY 10019-6829.

## Jurisdiction and Venue

6.     This Court has personal jurisdiction over the Underwriters because they have transacted business in the State of South Dakota, insuring the Assureds, and have entered into insurance contracts that are to be performed, in whole or in part, in South Dakota.

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332.  The present action is one between citizens of a State and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000.

8.     This is an action for declaratory relief pursuant to Federal Rule of Civil Procedure 57 and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and for damages against the Underwriters for bad faith and breach of contract.

9.     An actual controversy exists as to the rights and duties of the respective parties because of an insurance policy issued by the Underwriters under which the Assureds are insured.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2), because defendants conduct business within this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## The Insurance Policy

11.    DTU purchased directors and officers liability insurance coverage and professional liability insurance coverage for the period of October 1, 2003, to October 1, 2004, from the Underwriters.  A true and correct copy of the policy issued by The Underwriters, policy no. 823/FD0300761 (the "Policy"), is attached as Exhibit A.

12.    DTU is the assured under the Policy, and FDI and RAS are additional assureds under the Policy.  DTU, FDI, and RAS each is an *Insured* within the meaning of the Policy.

13.    The Policy premium was $227,000 and the Policy limit is $5,000,000.

14.    All Policy premiums were paid timely and fully, and the Policy was in full force and effect during the entirety of the designated coverage.

15.    The Policy provides coverage for Loss sustained by the Assureds as a result of a Claim against the Assureds for a Wrongful Act in the performance of Professional Services.

16.    The Policy defines *Professional Services* to encompass insurance claims and risk management services, including (in part):

(a) claims handling, adjusting, insurance administration and servicing;

(b) loss control;

(c) data processing;

(d) insurance consulting; and

(e) third-party administration.

-4-

17.    The Policy defines *Wrongful Act*, in relevant part, as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty . . . by or behalf of the Insured in the performance of Professional Services."

18.    The Policy defines *Loss* as:

compensatory damages, extracontractual obligations, punitive or exemplary damages, except as otherwise provided herein, settlements and Costs of Defense, provided, however, that Loss shall not include:

1.    fines or penalties;

2.    taxes; or

3.    any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

## The Underlying Business Relationships

19.    At all relevant times DTU and FDI wrote workers' compensation insurance for employers in Minnesota, South Dakota, Nebraska and Iowa.

20.    As DTU's attorney-in-fact and FDI's managing general agent, RAS provided all services to administer DTU and FDI, including (in part):

(a)    Appointment of agents, including payment of agents' commissions;

(b)    Designation of agent ownership of insurance contracts (or, allocation of business among agents); and

(c)    Administration of cede allowance paid to DTU and FDI from reinsurers.

21.    TREAN Corporation ("TREAN"), at all relevant times, was an insurance and reinsurance management company that provided reinsurance broker, underwriting,

and run-off services.  On information and belief, TREAN, at all relevant times, was not licensed to write workers' compensation insurance in Minnesota.  Nor was TREAN a licensed third-party administrator in Minnesota.  Andrew O'Brien ("O'Brien") was, at all relevant times, the President of TREAN.

22.    In 2001, O'Brien and RAS President Rick Johnson began discussing the prospect of RAS and TREAN forming a joint venture, TREAN Underwriting Group Services, LLC ("TUG").  TUG was to produce, underwrite, and process non-transportation workers' compensation insurance in Minnesota in which FDI underwrites risk, with DTU being utilized as necessary.

23.    TUG began operating in the first half of 2002.  TUG never operated as a managing general agent, and was never a licensed third-party administrator.

24.    RAS and TREAN contemplated from the outset that RAS was to supply all necessary administrative services to TUG. After TUG commenced operations, RAS supplied the following administrative services to TUG:

> (a) allocation of business;
>
> (b) accounting and record-keeping;
>
> (c) general administration of TUG's financial affairs;
>
> (d) preparation of TUG's financial statements;
>
> (e) coordination and processing of payroll, benefits, and human resources-
> related services for TUG employees'; and
>
> (f) day-to-day administrative functions as required generally to support
> TUG's business.

25. On December 31, 2002, RAS and TREAN formalized their joint venture through the Member Control Agreement, and the Operating Agreement of TUG. Neither agreement addresses the administrative services provided, and to be provided, to TUG by RAS, including the allocation of business to TUG.

26. RAS's provision of administrative services to TUG was not as a member or co-owner of TUG, but instead as TUG's *de facto* third-party administrator.

## The TUG Dispute

27. On April 30, 2004 TREAN filed a complaint against the Assureds in the United States District Court for the District of Minnesota, Case No. 04-2609 JMR/FLN. A true and correct copy of the original complaint is attached as Exhibit B. The claims for which the Assureds now seek coverage (the "TUG Dispute") were subsequently dismissed and referred to arbitration, at which time TREAN submitted an amended complaint, entitled Claimant's Amended Arbitration Demand. A true and correct copy of the Claimant's Amended Arbitration Demand is attached as Exhibit C.

28. In its pleadings, TREAN alleged that RAS: (a) misappropriated business opportunities belonging to TUG; (b) inflated revenues attributable to RAS and decreased revenues attributable to TUG; (c) for itself as agent for DTU and FDI, improperly allocated to TUG the expenses of RAS, DTU and FDI; and (d) failed to provide TREAN with complete, timely or accurate financial statements for TUG.

29. TREAN alleged the following causes of action related to the TUG Dispute: breach of fiduciary duty (against RAS only); breach of contract (against RAS only); and

unjust enrichment, money had and received, accounting, and fraud and misrepresentation against all defendants.

30.     None of the underlying conduct that gave rise to the TUG Dispute was performed in RAS's capacity as a member or operator of TUG. Instead, the conduct was performed in RAS's capacity as a third-party administrator, managing general agent, and attorney-in-fact; as FDI's third-party administrator and managing general agent, and as DTU's attorney-in-fact, RAS was responsible for producing business for, and allocating business between, agents for DTU and FDI. After TUG's formation, RAS had the responsibility to allocate business among agents for DTU, FDI, and TUG, in its capacities as DTU's attorney-in-fact, FDI's third-party administrator and managing general agent, and TUG's *de facto* third-party administrator.

31.     It was necessary for TUG to employ another entity to perform the roles of third-party administrator and managing general agent because TUG was not legally licensed to perform such services for itself.

32.     In claiming that RAS misappropriated business opportunities to TUG, misallocated revenue between RAS and TUG, and improperly allocated to TUG certain expenses of DTU, FDI, and RAS, TREAN was complaining about RAS's method of appointing agents and allocating business between TUG on the one hand and DTU or FDI on the other. In allocating business (which necessarily also entailed allocating revenue, including reinsurance ceding commission, and expenses) among DTU, FDI and TUG, RAS was performing Professional Services under the Policy.

33.     In performing the Professional Services described above, RAS was acting, in part, on behalf of DTU and FDI.  Additionally, DTU and FDI each performed Professional Services under the Policy when each retained the business, revenue and expenses allocated to it by RAS.

34.     TREAN agreed and stipulated that the TUG Dispute litigation be dismissed and referred to arbitration.  Before the arbitration hearing, the parties mutually agreed to a mediation process.  As a result of the mediation process, the parties agreed in principle to settle the arbitration case and all claims made by TREAN in the TUG Dispute.  TREAN and the Assureds resolved the TUG Dispute via Settlement Agreement executed on August 12, 2005.  The Assureds' related defense and settlement costs constitute a Loss under the Policy.

## The Underwriters' Wrongful Denial of Coverage

35.     The Assureds provided timely notice of the litigation to the designated agent of the Underwriters, and the Underwriters denied coverage without adequate investigation or requesting any additional information.

36.     Despite claims for coverage by three different entities, the Underwriters issued a summary denial without separately analyzing or addressing the coverage issues applicable to each entity.

37.     The Assureds subsequently notified the Underwriters' designated agent of the arbitration and settlement. The Underwriters again summarily denied coverage under the Policy and disregarded the facts and analysis provided by the Assureds, even though

the Assureds fully cooperated with the Underwriters' requests for documents and information.

38.     After the Assureds provided the requested documentation and detailed analyses demonstrating that the TUG dispute was covered under the Policy, the Underwriters remained indifferent to the facts and proofs submitted by the Assureds and based their denial of coverage on TREAN counsel's characterization of TREAN's claims.

39.     The Underwriters did not in good faith investigate and consider the analysis or supporting documents provided by the Assureds, or the facts and actual conduct underlying TREAN's allegations in the TUG Dispute.

## COUNT I

### (Declaratory Judgment)

40.     Plaintiffs repeat and reallege the allegations in paragraphs 1 though 39, as if fully set forth herein.

41.     An actual, substantial, and justiciable controversy presently exists between the parties regarding the extent to which coverage under the Policy requires the Underwriters to indemnify the Assureds for the settlement payments the Assureds are obligated to pay under the Settlement Agreement, and indemnify the Assureds for the reasonable and necessary legal fees and expenses incurred by the Assureds in the TUG Dispute litigation, arbitration, and settlement.

42.     Accordingly, the Assureds seek a judicial determination as to the parties' respective rights and obligations under the Policy in connection with the TUG Dispute

-11-

litigation, arbitration, and settlement, declaring that the Underwriters have a duty to

Indemnify the Assureds therefore.

## COUNT II

### (Breach of Contract)

43.     Plaintiffs repeat and reallege the allegations in paragraphs 1 though 42, as if fully set forth herein.

44.     Pursuant to the terms and conditions of the aforementioned Policy, the Underwriters are obligated to indemnify the Assureds for Loss sustained by the Assureds as a result of a Claim that is first made during the Policy period, October 1, 2003 through October 1, 2004, for a Wrongful Act in the performance of Professional Services.

45.     The Assureds' defense and settlement costs related to the TUG Dispute constitute a Loss as a result of a Claim for a Wrongful Act in the performance of Professional Services, and is therefore covered by the Policy.

46.     None of the exclusions in the Policy applies to bar coverage.

47.     In denying coverage to the Assureds, the Underwriters are in breach of the Policy, and the Assureds have been damaged thereby.

## COUNT III

### (Bad Faith)

48.     Plaintiffs repeat and reallege the allegations in paragraphs 1 though 47, as if fully set forth herein.

49.     Pursuant to the terms and conditions of the aforementioned Policy, the Underwriters are obligated to indemnify the Assureds for Loss sustained by the Assureds as a result of a Claim that is first made during the Policy period, October 1, 2003 through October 1, 2004, for a Wrongful Act in the performance of Professional Services.

50.     The Underwriters have repeatedly denied coverage under the Policy for the TUG dispute, and have done so in the absence of a reasonable basis for denial of the Policy benefits.

51.     The Underwriters have knowledge of, or at a minimum have recklessly disregarded, their lack of a reasonable basis for their denial, as the Underwriters have been and are recklessly indifferent to the facts and proofs submitted by the Assureds which show that the TUG dispute is covered by the Policy.

52.     The Assureds have been damaged by the Underwriters' bad faith.

## JURY TRIAL DEMAND

Dakota Truck Underwriters, First Dakota Indemnity Company, and Risk Administration Services, Inc., hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Dakota Truck Underwriters, First Dakota Indemnity Company, and Risk Administration Services, Inc., respectfully request that this Court enter judgment as follows:

1.     That the Court determine and declare that the Policy covers the claims asserted in the TUG Dispute litigation, arbitration, and settlement, and therefore the Underwriters are obligated to fully indemnify the Assureds;

2.     That the Underwriters be held contractually obligated to pay the Assureds their damages arising from the Underwriters' breach of contract, including, but not limited to their costs of defense and settlement payments;

3.     That the Underwriters be held liable in tort and therefore obligated to pay the Assureds their damages arising from the Underwriters' bad faith denial of coverage, including, but not limited to their costs of defense and settlement payments, and attorney's fees and costs herein; and;

4.     That the Assureds further have and recover pre-judgment and post-judgment interest, on all amounts awarded in this action, together with such other and further relief as the Court may deem just and proper under the circumstances.

Dated: March /2, 2007                          FAEGRE & BENSON LLP


                                               Bruce Jones, SBSD #2391*
                                               Diana Young Morrissey
                                               Michael M. Krauss
                                               Shane A. Anderson
                                               2200 Wells Fargo Center
                                               90 South Seventh Street
                                               Minneapolis, MN  55402-3901
                                               (612) 766-7000

fb.us.1761831.07

---

* A member of the bar of this Court and the State Bar of South Dakota.